## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSIAH CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 5142 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| GLEN D. TRAMMELL, TYRISHA M. | ) | |
| CLARY, DANIEL J. KACZROWSKI, | ) | |
| REENA GHODE, COLLIN MCARDLE, | ) | |
| and UNKNOWN EMPLOYEES OF THE | ) | |
| COOK COUNTY DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Josiah Clark is a pretrial detainee at Cook County Jail who suffers from epilepsy. For most of his detention, Clark has received medication for his epilepsy, but at lower dosages than what he was taking immediately prior to his detention. Clark believes the lower dosages caused a number of serious symptoms, including a grand mal seizure that he suffered in his cell on May 19, 2018. As a result, Clark brings claims under 42 U.S.C. § 1983 against various employees of the Cook County Health and Hospital System, whom he charges with failing to provide him with adequate medical care, and of the Cook County Department of Corrections, whom he charges with failing to respond to his grand mal seizure. Now before the Court is Defendants' motion to dismiss Clark's third amended complaint with prejudice. For the following reasons, the motion is granted in part and denied in part.

## I.  Background

### A.  Facts[1]

Clark has been a pretrial detainee at Cook County Jail since December 19, 2016.  3d Am. Compl. ¶ 1, ECF No. 41.  He suffers from epilepsy, for which he takes an anticonvulsant medication called Dilantin.  *Id.* ¶¶ 7–8.  The recommended daily dosage of Dilantin for an epileptic adult is 300 to 400 milligrams.  *Id.* ¶ 9.

Immediately prior to becoming a pretrial detainee, Clark's primary care physician had prescribed him a daily dosage of 400 milligrams of Dilantin.  *Id.* ¶ 8.  Clark received that amount because dosages of 200 or 300 milligrams were unable to control his seizures.  *Id.*

Upon arriving at Cook County Jail, Clark underwent an initial assessment conducted by Tyrisha Clary, a licensed physician.  *Id.* ¶¶ 2, 10.  Clark informed Clary that he was taking a daily dosage of 400 milligrams of Dilantin, but Clary cut his daily dosage in half, to 200 milligrams, without noting a reason for the decrease in Clark's medical records.  *Id.* ¶ 10.

Approximately a month later, on January 14, 2017, Glen Trammell, a licensed physician assistant, increased the daily dosage to 300 milligrams.  *Id.* ¶¶ 3, 11.  Clary and Trammell continued to prescribe that dosage for the next five months, during which time Clark began to experience "small seizures or periods of blank state due to the lower daily dosage of 300 milligrams."  *Id.* ¶ 12–13.  Trammell eventually increased Clark's daily dosage to 400 milligrams on June 14, 2017.  *Id.* ¶ 14.

---

[1]  The Court "must accept as true all well-pleaded facts" for purposes of reviewing a motion to dismiss.  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

That night, Clark experienced a mild seizure in his sleep and, as a result, missed his morning medications the following day. *Id.* ¶ 15. Clark felt dizzy after missing his medications—a warning sign of a seizure. *Id.* According to Clark, the nurse refused to give him his morning medications on July 29, and he again felt dizzy as a result. *Id.* ¶ 16. He missed them for a third time on August 17, causing him to suffer a mild seizure in his sleep the following night. *Id.* ¶ 17. Clark filed a grievance after each occasion that he missed his medication. *Id.* ¶¶ 15–17.

On September 16, 2017, Trammell decreased Clark's daily dosage of Dilantin back to 300 milligrams per day, without providing an explanation in Clark's medical records. *Id.* ¶ 18. Clark continued to receive that dosage for the next nine months, until, at about 2:50 a.m. on May 19, 2018, he suffered a grand mal seizure in his cell. *Id.* ¶ 19. The seizure lasted for ten to fifteen minutes, during which Clark's cellmate pressed the distress button inside their cell—one reserved for inmates with serious medical needs—and verbally called for help. *Id.* ¶¶ 40, 42–43. But neither the on-duty watch lieutenant, Collin McArdle, nor any on-duty correctional officer—who failed to make their routine rounds throughout Clark's cellblock—responded to these calls for help. *See id.* ¶¶ 36–37, 42, 71–73. In fact, the day before, on May 18, on-duty correctional officers had inspected the distress button inside Clark's cell and found that it was not functioning properly, but they did not fix or replace it in time for his grand mal seizure. *Id.* ¶ 41. When no one responded within thirty minutes of Clark's seizure, and seeing that no one was present at the guard station or anywhere in the cellblock, he and his cellmate went back to bed. *Id.* ¶ 45.

Trammell increased Clark's daily dosage of Dilantin back to 400 milligrams about two weeks later. *Id.* ¶ 22. It was reduced again to 300 milligrams by Daniel Kaczrowski, another licensed physician assistant, on December 14, 2018. *Id.* ¶¶ 5, 23. Kaczrowski did not provide a reason for the decrease in Clark's medical records. *Id.* But he noted that Clark was subtherapeutic on a daily dosage of 300 milligrams on January 9, 2019, and wrote him a prescription for 400 milligrams. *Id.* ¶ 24. The next day, Kaczrowski cancelled that prescription and, replaced it with one for a daily dosage of 350 milligrams, again without noting a reason for the change. *Id.* ¶ 26.

Reena Ghode, a licensed physician who specializes in neurology, ordered Clark a computer tomography ("CT") scan on March 1, 2019, as well as an electroencephalogram ("EEG") test on April 16, 2019. *Id.* ¶¶ 32–33. She noted that Clark's seizures were well controlled with a daily dosage of 400 milligram of Dilantin, but not with a daily dosage of 300 milligrams, to which she attributed his May 19, 2018, grand mal seizure, on March 3. *Id.* ¶¶ 4, 28. But, rather than increasing Clark's daily dosage to 400 milligrams, Ghode continued administering 350 milligrams. *Id.* ¶ 29. Kaczrowski did the same on April 30 and again on June 20. *Id.* ¶ 30. Clark's daily dosage of Dilantin remained at 350 milligrams as of August 7, 2019. *Id.* ¶ 31.

Clark asserts two claims under 42 U.S.C. § 1983 and the Fourteenth Amendment. *Id.* ¶¶ 56–75. Count I claim that Clary, Ghode, Trammell, and Kaczrowski failed to provide Clark "with adequate and appropriate medical care" in two ways. *Id.* ¶¶ 60, 63. First, it asserts that each of these Defendants provided inadequate care "by repeatedly under-prescribing him with a daily dosage" of

4

Dilantin. *Id.* ¶ 60. Second, Count I charges Ghode with further rendering inadequate medical care by "failing to order proper neurology diagnostics" following Clark's grand mal seizure. *Id.* ¶ 63.

Count II claims that McArdle and unknown correctional officers failed to provide "adequate and timely access to medical care" in response Clark's grand mal seizure—a "code blue" medical emergency—due to two underlying failures. *Id.* ¶ 73. First, it alleges that these Defendants failed to repair or replace the distress button inside Clark's cell in time for his grand mal seizure. *See id.* ¶¶ 41, 71. Second, Count II asserts that they failed to make their routine rounds during Clark's seizure, rendering them unable to hear his cellmate's calls for help. *See id.* ¶¶ 43, 45, 72.

## B.    Procedural History

Clark filed his initial complaint *pro se* on July 27, 2018. *See* Compl., ECF No. 4. That complaint asserted two claims: (1) a less detailed version of the claim against McArdle and unknown officers for failing to respond to his grand mal seizure (*i.e.*, Count II of the third amended complaint), which the Court dismissed pursuant to its initial screening under 28 U.S.C. § 1915A, *see* 9/6/20 Order at 3–4, ECF No. 5; and (2) a claim that Clark has since abandoned relating to Trammell's failure to treat a broken finger that he attributed to a basketball incident on May 30, 2018.

With the assistance of recruited counsel, Clark filed a first amended complaint on December 7, 2018. *See* Am. Compl., ECF No. 9. The first amended complaint maintained Clark's claim based on Trammell's failure to treat his broken finger, but swapped the less detailed version of Count II of the third amended complaint with a

5

less detailed version of Count I of the third amended complaint, against then-unknown medical Defendants. *See id.* ¶¶ 29–41. Clark filed a substantially similar second amended complaint a few weeks later. *See* 2d. Am. Compl., ECF No. 12.

Trammell moved to dismiss the count of the second amended complaint related to his alleged failure to treat Clark's broken finger, but the Court denied the motion. *See* 5/23/19 Order, ECF No. 25. Trammell then answered the second amended complaint, and the parties proceeded to discovery.

On March 3, 2020, Clark moved for leave to file a third amended complaint and to stay discovery, asserting that further amendment was needed to account for "previously undiscovered facts relating to the claims at issue," including the identities of the then-unknown medical Defendants (*i.e.*, Clary, Kaczrowski, and Ghode). *See* Pl.'s Mot. Leave File and Stay ¶¶ 4–5, ECF No. 37. Trammell did not oppose the motion, so the Court granted it. *See* 3/11/20 Min. Entry, ECF No. 40.

At this juncture, Defendants move to dismiss the third amended complaint with prejudice. *See* Defs.' Mot. Dismiss ("Mot."), ECF No. 57.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility

6

that a defendant has acted unlawfully." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Moreover, while courts "must take all of the factual allegations in the complaint as true" for purposes of a motion to dismiss, they are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim on which relief can be granted. *Iqbal*, 556 U.S. at 678.

### III.   Analysis

Defendants raise several arguments for dismissing Clark's third amended complaint, at least as it pertains to the *known* Defendants.[2] As to Count I, they argue that it fails to state a claim of constitutionally inadequate medical care against Clary, Ghode, Trammell, or Kaczrowski and, alternatively, that any such claim against Clary is untimely. As to Count II, they argue that it fails to allege that McArdle was personally responsible for the failure to respond to Clark's grand mal seizure and, therefore, fails to state a claim against him under § 1983. The Court addresses each count and each argument, in turn.

---

[2]     As discussed below, Defendants make just one perfunctory argument for dismissing Count II as to the *unknown* correctional officers against whom it is brought.

**A.     Count I**

Defendants primarily argue that Count I should be dismissed because it amounts to a mere disagreement with their medical judgments, not a claim that they rendered constitutionally inadequate medical care in treating Clark's epilepsy.

For many years, courts analyzed claims of inadequate medical care under the Fourteenth Amendment, which governs pretrial detention, using the 'deliberate indifference' standard of the Eighth Amendment, which governs incarceration. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018). As its name suggests, that standard "includes an objective and a subjective component." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019). But in *Kingsley v. Hendrickson*, the Supreme Court signaled that the proper standard under the Fourteenth Amendment "is solely an objective one." *See* 576 U.S. 389, 397 (2015) (addressing an excessive force claim). The Seventh Circuit has since extended *Kingsley*'s objective standard to claims of inadequate medical care arising out of pretrial detention. *See Miranda*, 900 F.3d at 352.

As a result, Clark's Fourteenth Amendment claims "are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *See id.* This inquiry "proceeds in two steps" in the medical context. *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018). At step one, the court "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of plaintiff's case." *Id.* (cleaned up). "A showing of negligence or even gross negligence will not suffice" at this step. *Id.*; *see Hardeman*

*v. Curran*, 933 F.3d 816, 826 (7th Cir. 2019) (Sykes, J., concurring in the judgment) ("*Kingsley* retained the rule that mere negligence is not a constitutional violation.").

At step two, the court "ask[s] whether the challenged conduct was objectively unreasonable." *McCann*, 909 F.3d at 886. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*[3]

Furthermore, it is well-established that "personal involvement" in an alleged constitutional deprivation "is a prerequisite for individual liability" under § 1983. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). For that reason, neither respondeat superior nor vicarious liability "applies to claims based on § 1983." *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). So, in addressing Clark's claims of inadequate medical care, the Court takes each Defendant in turn.

### 1. Defendant Clary

#### a. Objectively Unreasonable Medical Care

The Court begins with Clary, who was involved in treating Clark's epilepsy in two ways: (1) by prescribing him a daily dosage of 200 milligrams of Dilantin upon his arrival at Cook County Jail on December 29, 2016; and (2) by prescribing him a

---

[3]     As an initial matter, the Court notes that the complaint mistakenly contemplates the Eighth Amendment's 'deliberate indifference' standard in place of *Kingsley*'s objective standard. *See* 3d Am. Compl. ¶¶ 35, 53, 64–66, 73–74. In the medical context, the 'deliberate indifference' standard requires a plaintiff to show "that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Giles*, 914 F.3d at 1049 (cleaned up). That said, because the 'deliberate indifference' standard encompasses *Kingsley*'s objective standard, the Court finds that this oversight does not affect the analysis.

daily dosage of 300 milligrams of Dilantin (in tandem with Trammell) between January 14, 2017, and June 14, 2017. *See* 3d Am. Compl. ¶¶ 10–14.

With respect to Clary's initial prescription for a daily dosage of 200 milligrams, the Court finds that, while few, Clark's allegations suffice to state a claim that her treatment was objectively unreasonable. Here, Clary knowingly prescribed Clark a daily dosage of Dilantin that was just half of what his primary care physician had been prescribing, and just two-thirds of the low end of the recommended daily dosage for an adult. *See id.* ¶¶ 9–10. While these indicators need not necessarily have dictated Clary' "medical judgment," they should have alerted her to a substantial risk" that the dosage she initially prescribed was "dangerous[ly]" low. *See McCann*, 909 F.3d at 886–87. And because Clary did not provide a reason for decreasing Clark's dosage to such an extent, 3d Am. Compl. ¶ 10, the Court cannot rule out a reasonable inference that doing so was objectively unreasonable under "the totality of facts and circumstances" facing her, *see McCann*, 909 F.3d at 886.

At the same time, the Court reaches a different conclusion with regard to Clary's subsequent prescriptions for 300 milligrams of Dilantin per day. Clark argues that these, too, were objectively unreasonable because, as his primary care physician had discovered, that dosage was still inadequate to control his epilepsy. *See* 3d Am. Compl. ¶ 9. But the recommended daily dosage is 300 to 400 milligrams. Moreover, Clark does not allege that he relayed that information to Clary or otherwise pressed upon her that 300 milligrams was an inadequate dosage; instead, he merely told her that he was previously prescribed a daily dosage of 400 milligrams. *See id.* ¶ 10. *That*

information alone does not establish that Clark's previous dosage was the sole reasonable one, especially given that 400 milligrams not only marks the high end of the recommended daily dosage for an adult, *see id.* ¶ 9, but also, the complaint implies, carries an increased risk of toxicity compared to lower dosages, *see id.* ¶ 28. Moreover, while Clark alleges that he began to suffer small seizures due to the dosage of 300 milligrams, *id.* ¶ 13, he does not allege that he ever told that to Clary before his dosage was increased to 400 milligrams on June 14, 2017, *see id.* ¶ 14. Thus, on these facts, the Court finds that it would be unreasonable to infer that Clary's prescriptions for 300 milligrams of Dilantin were objectively unreasonable.

The cases on which Clark relies do not mandate a different result. He is correct that, in *Fox v. Ghosh*, the plaintiff was deemed to have stated a *Monell* claim under § 1983 where he alleged that an entity contracted to provide health care to inmates in Illinois prisons "maintained a policy or procedure under which inmates with serious medical conditions," including epilepsy, "were routinely denied access to proper or sufficient medication and/or medical care." No. 09 C 5453, 2010 WL 345899, at *4 (N.D. Ill. Jan. 26, 2010) (internal quotation marks omitted). But, there, the plaintiff claimed that the health care provider maintained a policy of completely denying accessing to sufficient epilepsy treatment, while in this case, Clark received medication for his epilepsy within the recommended range.

Similarly, in *Ojeda v. Kramer*, the plaintiff stated a claim of deliberate indifference where he alleged that he had "communicated to [the defendants] that he was receiving incorrect dosages of his medications" and that "he was suffering from

resulting symptoms." No. 15 C 7309, 2017 WL 1250834, at *3 (N.D. Ill. Apr. 5, 2017). But again, Clark fails to allege such communications here. Finally, in *Varela v. Lake County*, the plaintiff stated a claim of objectively unreasonable medical care where he alleged that the defendants "did not act in compliance with medical orders" and "ignored [his] persistent complaints and obvious signs of his serious medical conditions," including by refusing to give him an inhaler or seek emergency care for his collapsed lung. No. 18 C 6818, 2019 WL 3208369, at *3 (N.D. Ill. July 16, 2019). Clark, however, alleges no such malfeasance on Clary's part here. Accordingly, to the extent that Clark's claim is premised on the fact that he was only provided 300 milligrams of Dilantin per day, it is dismissed.

### b.    Statute of Limitations

That brings the Court to Defendants' alternative argument that Clark's claim—which the Court now has limited to his receipt of only 200 milligrams of Dilantin per day—is barred by the statute of limitations. Suits under § 1983 borrow the forum state's personal-injury statute of limitations, which is two years in Illinois. *Licari v. City of Chi.*, 298 F.3d 664, 667–68 (7th Cir. 2002). And under federal law, that limitations period accrues, or begins to run, when the plaintiff "knows his injury and its cause." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012).

The federal rule of accrual raises a problem that the parties overlook: the Court cannot determine when, if at all, Clark's claim accrued, because he fails to allege any cognizable injury during the few weeks that he was given only 200 milligrams of Dilantin per day. Article III requires a plaintiff to allege a "concrete,"

12

"particularized," and "actual or imminent" injury caused by the "conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And such an injury, otherwise called an "injury-in-fact," is a prerequisite of federal jurisdiction. *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 737 (7th Cir. 2008).[4]

In their briefs, the parties presume that the claim at issue accrued at the moment Clark's dosage allegedly became objectively unreasonable—in other words, when he started to receive 200 milligrams of his medication upon arriving at the Jail on December 29, 2016.[5] But a "bare" violation of Clark's right to objectively reasonable medical care is merely a potential *cause* of injury, not an injury unto itself. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (recognizing that "a bare procedural violation, divorced from any concrete harm," does not "satisfy the injury-in-fact requirement of Article III"). Thus, the plain fact that Clark received a daily dosage of 200 milligrams of Dilantin, unaccompanied by any "concrete harm," does not constitute injury-in-fact. *See id.*

---

[4] Though Defendants did not raise the issue of standing with respect to this part of Count I, the Court reaches it *sua sponte* here in light of its obligation to ensure standing at all stages of a case. *See Freedom From Religion Found.*, 536 F.3d at 737. Furthermore, while a dismissal for lack of standing falls under Rule 12(b)(1), the legal standard is the same as under Rule 12(b)(6). *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

[5] Clark also argues that Clary's conduct forms part of a continuing violation, such that the accrual date "cannot be readily and accurately ascertained at this stage." Resp. at 12. But first of all, that argument still confuses a violation of rights for an injury-in-fact. What is more, as the Court explains below, it does not agree that Clark has stated a continuing violation under Count I. And even if he had, the complaint does not trigger the continuing violation doctrine because it does not allege that Clary retained "the power to do something about [Clark's] condition" after she stopped treating him. *See id.* (quoting *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001)); *cf.* 3d Am. Compl. ¶ 2 ("Dr. Tyrisha M. Clary . . . is a licensed Physician who . . . *at the time of specific events described herein*, was responsible for the administration of medical treatment to [Clark]." (emphasis added)).

13

The complaint fails to indicate any concrete harm accompanying Clark's daily dosage of 200 milligrams.  Granted, it does at one point allege that all four medical Defendants "exposed [Clark] to a substantial risk of serious harm, and caused him to suffer unnecessary and prolonged pain, emotional trauma, and damage in a personal and pecuniary nature."  3d Am. Compl. ¶ 65.  But it is well established that "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e); *see also id.* § 1997e(h) (defining "prisoner" to include pretrial detainees). And here, the first physical injury that Clark alleges are the small seizures he began to suffer sometime after his dosage was increased to 300 milligrams, and which he attributes solely to that subsequent dosage.  *See* 3d Am. Compl. ¶ 13.  As a result, Clark fails to tether any pain or other physical injury to the dosage at issue.

That leaves Clark's suggestion that his initial prescription of 200 milligrams "exposed [him] to a substantial risk of serious harm."  *See id.* ¶ 65.  It is true that a "substantial risk" of a "sufficiently imminent" future injury can satisfy Article III. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–19 (2014) *(*cleaned up). But, in order to allege "a sufficiently imminent injury," *see id.* at 152, it follows that the risk must be present and ongoing, not a mere thing of the past.  Given that Clark is complaining of past events, that is not the case here.

Accordingly, Count I fails to demonstrate that Clark has standing to challenge Clary's initial prescription of 200 milligrams of Dilantin, and fails to state a claim with respect to her subsequent prescription of 300 milligrams of Dilantin.

14

### 2. Defendant Trammell

Clark also targets Trammell with providing inadequate medical care in two ways: (1) by prescribing Clark a daily dosage of 300 milligrams of Dilantin (in tandem with Clary) between January 14, 2017, and June 14, 2017; and (2) by lowering Clark's daily dosage back to 300 milligrams from September 16, 2017, until June 1, 2018, after temporarily raising it to 400 milligrams in the interim. *See* 3d Am. Compl. ¶¶ 11–14, 18, 22.

As to the first period in question, Clark fails to state a claim for reasons similar to those discussed above. Simply put, the complaint does not establish that it was objectively unreasonable for Trammell to prescribe a dosage of 300 milligrams during the first half of 2017. While Trammell presumably knew that Clark had previously been prescribed a dosage of 400 milligrams, Clark does not allege that Trammell knew or should have known at that time that a dosage of 300 milligrams—one within the recommended range, and posing a lower risk of toxicity—was inadequate. Nor does Clark allege that Trammell knew of Clark's small seizures due to that lower dosage before raising his dosage to 400 milligrams on June 14, 2017. *See id.* ¶¶ 13–14. As a result, Clark fails to allege objectively unreasonable care in this respect.

The second period of time presents a closer question. On the one hand, Clark places too much reliance on the mild seizure and bouts of dizziness that he experienced between June 15, 2017, and August 17, 2017. *See id.* ¶¶ 15–17. Given Clark's theory that these "warning signs" occurred because he had missed his medications altogether (for reasons not attributed to any Defendant), *see id.* ¶¶ 16–

17, they shed little to no light on the proper dosage. Clark also overlooks the fact that the first of these seizures took place on the very night after Trammell increased his daily dosage to 400 milligrams, and before Clark missed his medications on June 15, 2017. *See id.* ¶ 15. Moreover, even accepting Ghode's later opinion that Clark's daily dosage of 300 milligrams ultimately caused the grand mal seizure, *see id.* ¶ 28, that alone does not demonstrate that such a dosage was objectively unreasonable at the time it was prescribed, *see McCann*, 909 F.3d at 887 (holding that an overprescription of methadone that resulted in death was not objectively unreasonable).

On the other hand, the Court finds it significant that Trammell decreased Clark's daily dosage back to 300 milligrams despite the small seizures that Clark had experienced during the first half of 2017. *See* 3d Am. Compl. ¶ 13. It is reasonable to infer that Trammell knew of these symptoms and that he had increased Clark's daily dosage to 400 milligrams on June 14, 2017, because of them. *See id.* ¶ 14. Thus, by the time his dosage was reduced on September 16, 2017, Trammell had reason to believe that 300 milligrams of Dilantin was an "incorrect dosage[]," from which Clark had "suffered . . . resulting symptoms." *See Ojeda*, 2017 WL 1250834, at *3. As a result, while Trammell's decision to reduce Clark's dosage back to 300 milligrams may prove to have been a reasonable exercise of medical judgment, the Court cannot rule out the contrary inference at this time.

Accordingly, Count I states a claim against Trammell with respect to the daily dosage of 300 milligrams that Clark received between September 16, 2017, and June 1, 2018, but not between January 14, 2017, and June 14, 2017.

### 3. Defendant Kaczrowski

Kaczrowski also is charged with failing to provide adequate treatment of Clark's epilepsy in two respects: (1) by decreasing his daily dosage of Dilantin back to 300 milligrams on December 14, 2018, after Trammell had restored it to 400 milligrams on June 1, *see* 3d Am. Compl. ¶¶ 22–23; and (2) by essentially maintaining Clark's daily dosage at 350 milligrams from January 10, 2019, through its last reported date, *see id.* ¶¶ 24–31.

Regarding the first, Clark narrowly states a claim. On the one hand, it appears that Kaczrowski did not note that Clark "was subtherapeutic" on that dosage until some three weeks later, *see id.* ¶ 23–24, while Ghode did not attribute Clark's grand mal seizure to that dosage until some three months, *see id.* ¶¶ 28, making these poor indicators of objectively unreasonable care. On the other hand, however, the fact that Clark suffered a grand mal seizure after taking 300 milligrams for nine months, *see id.* ¶¶ 18–19, and had suffered small seizures due to such a dosage level, *see id.* ¶¶ 13, raises a reasonable inference that Kaczrowski's unexplained reinstatement of that lower dosage was objectively unreasonable.

As for Clark's most recent daily dosage of 350 milligrams of Dilantin, the complaint does not allow the inference that it is objectively unreasonable because the complaint fails to allege that it is inadequate to treat his epilepsy. Instead, the complaint's allegations of inadequacy all stop at 300 milligrams, leaving a hole between that dosage and Clark's preferred dosage of 400 milligrams. *See* 3d Am. Compl. ¶¶ 8, 24, 28. By the same token, the complaint does not indicate that any of

17

Clark's previous medical providers had ever tried that dosage. And the complaint does not assert that Clark has suffered any physical symptoms since he began receiving it. As a result, the Court cannot say that Kaczrowski's treatment since January 10, 2019, has been objectively unreasonable.

Accordingly, Count I states a claim against Kaczrowksi with regard to the dosage of medication that Clark received between December 14, 2018, and January 10, 2019, but not thereafter.

### 4. Defendant Ghode

That leaves Ghode, whom Clark charges with providing inadequate medical care: (1) by continuing his daily dosage at 350 milligrams of Dilantin between March 3 and April 30, 2019, *see* 3d Am. Compl. ¶¶ 29, 58, 64; and (2) by waiting nearly eleven months after his May 19, 2018, grand mal seizure to order "proper neurological treatment," *see id.* ¶ 66.

Regarding the dosage aspect, Clark fails to state a claim against Ghode for the same reasons discussed with respect to Kaczrowski: because he fails to establish that a daily dosage of 350 milligrams of Dilantin is inadequate to treat his epilepsy.

As for the allegations regarding neurological testing, Defendants first contend that Ghode's delay in ordering a CT scan and an EEG test for Clark is not actionable because it was "minor." Mot. at 12. But, taking all the allegations to be true and construing all inferences in Clark's favor, the Court cannot say that waiting almost a year after Clark's grand mal seizure to order such basic evaluations does not constitutes objective unreasonable medical care.

18

Defendants also argue that Clark fails to associate any "actual or imminent" injury with Ghode's delay in ordering neurological testing. *See Lujan*, 504 U.S. at 560. Defendants are correct. At one point, complaint does claim that Ghode's delay "continues to expose [Clark] to a substantial risk of serious harm." 3d. Am. Compl. ¶ 66. But it does not provide any "factual content" to support this "mere conclusory statement[]," so the Court is not bound to accept it. *See Iqbal*, 556 U.S. at 678. And in any event, Clark failed to respond to this argument in his brief, and thus waived any counterargument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

Accordingly, the Court concludes that Count I fails to state a claim against Ghode. To sum up, this count may proceed only against Trammell and Kaczrowski with respect to the daily dosage of 300 milligrams of Dilantin that Clark received between September 16, 2017, and June 1, 2018, and again between December 14, 2017, and January 10, 2019. In all other respects, Count I is dismissed.

## B. Count II

Defendants next argue that Count II should be dismissed as to McArdle because it is premised solely on his supervisory status, not his personal involvement in the alleged failure to respond to Clark's grand mal seizure. *See Gossmeyer*, 128 F.3d at 495; *Kinslow*, 538 F.3d at 692. As Defendants read it, the complaint alleges that only the unknown correctional officers named in Count II were responsible for repairing the distress button inside Clark's cell and keeping watch over Clark's

cellblock at the time of his grand mal seizure. In Clark's view, the complaint alleges that McArdle shared in both responsibilities.

The Court agrees with Clark to the extent that Count II is premised upon a failure-to-keep-watch theory. The complaint alleges that McArdle "served as Watch Lieutenant over [Clark's] cell block" during the overnight shift when Clark experienced his May 19, 2018, grand mal seizure, 3d Am. Compl. ¶ 36, and that he *and* unknown correctional officers "failed to make their routine rounds . . . throughout [Clark's] cell block," *see id.* ¶ 72. The complaint also alleges that Clark "did not see any officer *or watch lieutenant* present at the [guard] station or anywhere in the cellblock" for at least thirty minutes following his grand mal seizure. *Id.* ¶ 45 (emphasis added). Taken as true, these allegations suffice to establish that McArdle had some responsibility for keeping watch over Clark's cellblock at the time of his grand mal seizure.

That said, the Court agrees with Defendants that only the unknown correctional officers are subject to Count II's failure-to-repair theory. In this regard, the complaint charges only the "Unknown Employees" who had discovered the malfunctioning distress button inside Clark's cell the day before with failing to repair or replace it in time for Clark's grand mal seizure. *See id.* ¶ 41. In his brief, Clark argues that McArdle shares responsibility for this failure because the Cook County Department of Correction's policies "specifically required [him] 'to ensure [that] all necessary equipment' was 'in working order.'" Resp. at 15, ECF No. 61. But contrary to Clark's assertion (and consistent with the complaint's allegations), the policies

attached to the complaint indicate that the policy in question applies only to the officers who inspected Clark's cell and to the on-duty supervisor at that time, which McArdle is not alleged to have been. *See* 3d Am. Compl., Ex. A, Cook County Dep't Corr. Cermak Medical Living Unit Officer Policies at 3, ECF No. 41-1; *see also* 3d Am. Compl. ¶ 52.[6]

Accordingly, Count II states a claim against McArdle with regard to the alleged failure to keep watch over Clark's cellblock during his May 19, 2018, grand mal seizure, but not the alleged failure to repair or replace the distress button inside Clark's cell the preceding day.

Finally, Defendants request that any dismissal of Counts I and II be with prejudice. But the Court finds that a dismissal without prejudice is more appropriate. While this may be Clark's fourth complaint, it is the first time that the Court has addressed many of the issues raised by Defendants. And the Court does not believe that amendment would be clearly futile. Therefore, the Court will afford Clark one more opportunity to replead these counts.

---

[6]     In passing, Defendants also assert that "[n]o defendant can be held liable" for failing to repair the distress button "because there was no realistic opportunity to [do so] prior to Clark's seizure." Mot. at 10. Even assuming this "perfunctory" argument is not waived, *see United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991), the Court agrees with Clark that the complaint allows for a reasonable inference that the unknown officers who inspected Clark's cell had a realistic opportunity to repair or replace the distress button before his grand mal seizure.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Count I may proceed against Trammell and Kaczrowski with respect to the daily dosage of 300 milligrams of Dilantin that Clark received between September 16, 2017, and June 1, 2018, and again between December 14, 2017, and January 10, 2019.  Count II may proceed against McArdle with respect to the alleged failure to respond to Clark's May 19, 2018, grand mal seizure, as well as against the unknown Defendants.  The remainder of the third amended complaint is dismissed without prejudice.  Clark may either stand on the surviving portions of the complaint or submit a fourth and final amended complaint no later than March 30, 2021, to the extent he can cure the defects identified in this order.


**IT IS SO ORDERED.**                    **ENTERED    3/16/21**

_____

**John Z. Lee**
**United States District Judge**

22